IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | No. 08 CR 742 |
| v. ) | |
| ) | Judge Robert M. Dow, Jr. |
| CLIFTON BANKS. ) | |

**MEMORANDUM OPINION AND ORDER**

A grand jury issued an indictment charging Defendant Clifton Banks with unlawful use of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Currently before the Court are Defendant's motion to suppress physical evidence and statements [24], Defendant's motion to suppress physical evidence seized from vehicle and all statements subsequently made by Defendant [27], Defendant's memoranda of law in support of his motions [26, 29], the Government's consolidated response to Defendant's motions [33], and Defendant's consolidated reply in support of his motions [34]. In addition to considering the extensive briefing submitted by the parties, the Court heard oral argument from counsel on the motions. For the reasons stated below, the Court respectfully denies both of Defendant's motions [24, 27].

**I.     Background[1]**

   **A.     The search warrant**

On February 16, 2008, Chicago Police Officer Joe Fernandez met with an informant who reported that on several occasions, including earlier that day, he had purchased "rocks" of crack cocaine from two African-American men at a house located at 6809 S. Throop in the Englewood

---

[1] As noted in the parties' briefs and confirmed at oral argument, the facts that are germane to Defendant's motions have been drawn from official police reports, grand jury testimony, and witness interviews and are not in dispute.

neighborhood of Chicago. The informant provided a description of the men, but did not know their names.

On the basis of the information provided by the informant, Officer Fernandez obtained a warrant to search the home at 6809 S. Throop for crack cocaine, drug paraphernalia, money, and records relating to drug sales and occupancy of the residence. The warrant specifically authorized the search of an unknown black male, approximately 23 years old, 5'10", 175 pounds, with dark skin and short black hair.

After the warrant was issued, a team of fourteen Chicago police officers including Fernandez assembled to formulate a plan for executing the warrant. The officers then left the police station in several unmarked police cars and one marked unit. At that time, the officers all were armed and wore "raid" jackets and protective vests.

At approximately 4:00 p.m., the officers arrived at the scene of the target premises. At approximately the same time, Defendant, a 47 year old African American male who stands 5'7" and weighs 165 pounds, drove up in a gray Nissan Rogue and parked the vehicle in a nearby vacant lot. Defendant exited the vehicle and began walking quickly toward the 6809 S. Throop residence. Chicago Police Officer Ildefonso Chavez observed Defendant walk from the vehicle to the porch of the residence; Officer Fernandez saw Defendant knock on the door.

   **B.  The detention, frisk, and arrest of Defendant**

Officer Chavez ordered Defendant to "get down." Defendant complied with the order, kneeling down on the porch and putting his hands on the railing. Chavez stood on the porch facing Defendant as other officers knocked on the door and, after hearing no answer, forced their way into the house to execute the warrant. As soon as the other officers entered the house, Chavez patted down Defendant and felt a large lump in the pocket of Defendant's jacket. At the

same time, Chavez smelled the odor of marijuana, with which he was familiar through his experience on the police force. Both Officer Chavez and Officer Fernandez commented that they smelled "weed" – a slang term for marijuana – and Chavez asked Defendant if he had weed. Defendant responded to the effect that the substance in his pocket was "weed,"

Officer Chavez then removed a clear plastic bag from Defendant's pocket. A laboratory test later confirmed that the bag contained slightly less than one ounce of marijuana. After seeing the object, Chavez placed Defendant under arrest and handcuffed him. Chavez then conducted a further search of Defendant's pockets and removed a car key.

Several minutes later, in the presence of Officer Chavez, Officer Fernandez asked Defendant what he was doing at the Throop residence. Defendant responded that he had come to that location "to buy a rock" – which the officers understood to be a slang term for crack cocaine. Officer Fernandez then asked Defendant which car he had driven. Defendant gestured toward the Nissan Rogue, and Chavez pointed to that same vehicle, from which he previously had witnessed Defendant exit earlier in the afternoon. Officers Steve Lavielle and Daryl Smith were directed to watch Defendant's vehicle as the search of the residence was being completed. After the warrant had been fully executed, officers transported Defendant to the Seventh District station house. The total time lapsed on the scene of the Throop residence was approximately 30 to 45 minutes.

### C. The search of Defendant's vehicle

After the other officers and Defendant left the scene, Officers Lavielle and Smith remained behind to conduct an inventory search of Defendant's vehicle. Both officers smelled a strong odor of marijuana in the car. On the driver's side floor, Lavielle found a partially opened blue book-bag containing two baggies with a substance that turned out to be marijuana and a

3

loaded Bryco model .32 caliber pistol. Defendant's vehicle later was transported to the police station, where Lavielle again searched it and documented the vehicle's condition using a standard Chicago Police Department form called a "Vehicle Tow Report." He also completed an inventory of all of the items found in the vehicle.

### D. The interview of Defendant at the police station

At approximately 8:35 p.m., about four and a half hours after the execution of the search warrant began, Officers Fernandez and Smith interviewed Defendant at the station. Officer Fernandez advised Defendant of his *Miranda* rights, after which time Defendant admitted to knowingly possessing the firearm and the marijuana that was found in the Nissan Rogue earlier that day.

## II. Analysis

Defendant has moved to suppress (i) the physical evidence seized by the officers on February 16, 2008 – including the marijuana and the key found on his person and the marijuana and the handgun found inside the vehicle – and (ii) the statements that he made to the officers later that day. Defendant contends that the officers unlawfully detained and searched him in violation of his Fourth Amendment rights. He further contends that the officers had no right to search the vehicle that he was operating. And, if those arguments are well founded, Defendant asserts that the evidence and statements obtained by police constitute "fruits of the poisonous tree" that cannot be used in any trial of this case.

The Government responds that the initial detention and frisk at the Throop residence were justified on two grounds: (i) Officer Chavez had a reasonable, articulable basis to suspect that Defendant may have been involved in criminal activity as he approached the residence in question and (ii) Officer Chavez was reasonably concerned that Defendant posed a threat to the

officers and to the smooth execution of the search warrant. The Government further submits that once Chavez smelled the odor of marijuana on the Defendant's person and felt the lump in Defendant's pocket during the pat-down frisk, which Defendant promptly confirmed was "weed," Chavez had probable cause to arrest Defendant. Finally, the Government contends that, given Defendant's further acknowledgment that he had come to the location to "buy a rock," the search of the vehicle was proper as an inventory search under a local ordinance authorizing the impoundment of vehicles used in an attempt to purchase a controlled substance.

### A. The initial encounter at the Throop residence

As part and parcel of the right of individuals "to be secure in their persons," the Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend IV. The Seventh Circuit recently explained that the "reasonableness requirement strikes a balance between an individual's interest in being left alone and the public's interest in community safety, crime control, and the safety of law enforcement officers engaged in the work of protecting the public and investigating crime." *United States v. Jennings*, 544 F.3d 815, 819 (7th Cir. 2008). This case presents the question of "what police may lawfully do with persons who happen to find themselves in the middle of a drug raid." *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190 (3d Cir. 1995).

#### 1. Detention of the Defendant

It is clear that the Fourth Amendment "authorizes officers executing a search warrant to 'take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search.'" *Jennings*, 544 F.3d at 818 (quoting *Los Angeles County, Cal. v. Rettele*, 550 U.S. 609, 614 (2007)). In fact, officers executing a search warrant "have categorical authority to detain any occupant of the subject premises during the search," not only because "the probable

5

cause underlying a warrant to search a premises gives police reason to suspect that its occupants are involved in criminal activity," but "also because the officers have a legitimate interest in minimizing the risk of violence that may erupt when an occupant realizes that a search is underway." *Id*. In addition, the Seventh Circuit, following the decisions of its sister circuits, has extended that rule to permit police to "detain people who approach a premises where a search is in progress." *Id*.; see also *United States v. Sanchez*, 555 F.3d 910, 918 (10th Cir. 2009) ("We therefore conclude that the authority to detain relates to all persons present on the premises.").

The courts of appeals have offered several justifications for the rule that individuals who for whatever reason find themselves at the scene of an ongoing search are subject to at least a temporary detention by law enforcement officers. In *Jennings*, the Seventh Circuit found that in view of the entry of the defendant into the "security perimeter surrounding the apartment where the narcotics search was underway" and the "elevated risk of violence during a search for narcotics," the officers "were reasonably concerned for their own and for [the defendant's] safety, as well as for any activity that might compromise the search." 544 F.3d at 818. Echoing the Seventh Circuit's views, the Tenth Circuit has held that officers may detain individuals "whose presence at the scene raised a concern about interference with the search." *Sanchez*, 555 F.3d at 918. The Sixth Circuit also has pointed to concerns about the defendant's own safety as a factor justifying detention of an individual who approached a house in which armed officers were in the process of executing a search warrant. *Bohannon*, 225 F.3d at 617. And the Third Circuit, too, has found it "entirely reasonable" for officers to detain persons "standing in the middle of [a drug] raid," at least "until the situation [is] under control." *Baker*, 50 F.3d at 1191. As the Seventh Circuit summarized, "the officers' interest in maintaining control inside their security perimeter until the SWAT team secured the targeted apartment for the search far

6

outweighed [the defendant's] interest in being left alone for the few moments that he was detained." *Jennings*, 544 F.3d at 819.

The timing of an individual's appearance on the scene of an ongoing police operation also bears on the reasonableness of the officers' actions. In each of the most analogous decisions discussed by the parties in their briefs and at the hearing, the courts have agreed that persons who are present as the execution of the warrant commences are subject to at least temporary detention. See *Jennings*, 544 F.3d at 818-19; *Bohannon*, 225 F.3d at 617; *Baker*, 50 F.3d at 1190 (upholding detention of defendant who arrived on the scene "just as the police were initiating a drug raid"). Even Judge Batchelder, who dissented in *Bohannon*, agreed that authorities lawfully may "detain all persons *who are on the premises to be searched when the police execute a search warrant*." 225 F.3d at 618 (Batchelder, J., dissenting). However, she felt that the detention was unlawful on the facts of that case because the defendant "arrived after the search had been substantially completed" and "the police already had complete control of the situation, many of the officers had already left the scene, and all that remained was the final paperwork." *Id.*

On the basis of the decisions cited above, the Court has no difficulty in concluding that the temporary detention of Defendant on the porch of a residence where fourteen armed police officers were about to execute a valid narcotics search warrant comported with the Fourth Amendment. The Defendant arrived contemporaneously with the officers at a location where drug deals had taken place that very day. He went directly to the porch, and thus was standing clearly within any reasonable concept of a "security perimeter" at the time that the officers encountered him. And at that time, fourteen armed, vested officers were getting in place to execute warrant on the premises. For all of the reasons noted above – that is, to take

unquestioned command of the situation, to ensure safety of all present, and to effectively execute the search itself – the officers acted reasonably in detaining Defendant.

Defendant calls the Court's attention to various ways in which the specific facts of this case differ from the scenario that unfolded in *Jennings*. In particular, Defendant stresses that the raid in *Jennings* occurred at night, the officers were armed with high-powered rifles with wall-penetrating bullets, and that the defendant made furtive movements that the officers observed prior to detaining him. The Court acknowledges those distinctions, but finds them insignificant in the overall analysis of whether the officers acted reasonably in deciding to detain Defendant on the porch of the residence. True, the facts of *Jennings* were more extreme. But the well-enshrined principle stemming from the Supreme Court's decision in *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981), and recently reaffirmed in our circuit in *Jennings*, 544 F.3d at 819, that police officers may "'exercise unquestioned command of the situation' by detaining [the defendant] long enough to ensure that he was unarmed and uninvolved in criminal activity" provides ample justification for the initial detention of Defendant in the circumstances of this case. Even if the officers executing the warrant had no assurance that the occupants of the residence to be searched were armed, they did know that an informant had purchased drugs at that location on several occasions, including earlier that day. As many courts have observed, the correlation between drug trafficking and firearms is well established and requires vigilance on the part of officers performing their duties. See, *e.g.*, *United States v. Becerra*, 97 F.3d 669, 671-72 (2d Cir. 1996) (noting that it is reasonable to suspect that "drug dealers commonly keep firearms on their premises as tools of the trade"); *United States v. White*, 648 F.2d 29, 36 n.29 (D.C. Cir. 1981) (observing that a study of drugs and violence justifies police drawing weapons

because "odds [are] too high to require policemen to play 'russian roulette' each time they effect a drug arrest").

## 2. The pat-down frisk of Defendant

Having determined that the initial detention of Defendant was lawful, the Court next must consider whether the pat-down frisk of Defendant performed by Officer Chavez comported with the Fourth Amendment. In the Court's view, it is every bit as much a "logical extension" of the rule of *Summers* and the reasoning of the decisions of other courts of appeals to permit a pat-down frisk as it is to permit a brief detention of individuals who enter the "security perimeter" of an ongoing narcotics search.

The "rule" of *Summers*, as stated by the Seventh Circuit in *Jennings*, is that officers may "'exercise unquestioned command of the situation' by detaining [the defendant] long enough to ensure that he was unarmed and uninvolved in criminal activity." 544 F.3d at 819 (quoting *Summers*, 452 U.S. at 702-03). It would be inconsistent with that "rule" to forbid officers to perform a "pat-down" frisk on individuals whom they encounter on the premises while executing a narcotics search warrant. Defendant's suggestion that the officers simply could have asked him a few questions about his identity and purpose and then ordered him to leave the premises would have left the officers in the position of looking over their shoulders to ensure that they were not too trusting. Part and parcel of taking "unquestioned command" of a situation is ensuring that nobody on the scene other than law enforcement personnel is armed. Here, it is undisputed that Officer Chavez conducted only a pat-down frisk of Defendant's outer clothing. And there is no suggestion that the frisk was motivated by anything other than the need to secure the immediate vicinity of the ongoing judicially-approved police operation. In these circumstances, given "the limited nature of the intrusion and the officers' compelling need to

9

maintain control within the security perimeter" (*Jennings*, 544 F.3d at 819) the Court cannot conclude that the officers acted unreasonably in the circumstances in frisking Defendant. *Cf. United States v. Hendricks*, 319 F.3d 993, 1004 (7th Cir. 2003) (explaining that when conducting a *Terry* stop, an officer "is entitled 'to take reasonable steps to insure [his] own safety,'" including "conduct[ing] a pat-down search of the detainee's outer clothing") (quoting *United States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002)); *Baker*, 50 F.3d at 1194 (distinguishing a "limited *Terry*-frisk," from a "full-scale search[] for evidence").

In sum, in view of the threat to the officers' ability to "exercise unquestioned command of the situation" (*Summers*, 452 U.S. at 703) posed by Defendant's appearance on the scene, the officers' on-the-spot decision to briefly detain and perform a pat-down search of Defendant was not unlawful under *Summers*, *Jennings*, and the court of appeals decisions on which *Jennings* builds that address "what police may lawfully do with persons who happen to find themselves in the middle of a drug raid." *Baker*, 50 F.3d at 1190.[2] And because the Court finds the officers' actions objectively reasonable under that line of cases, it need not consider the Government's

---

[2] The Court is not persuaded by Defendant's contention that the Eighth Circuit's decision in *United States v. Clay*, 640 F.2d 157 (8th Cir. 1981), is to the contrary. In *Clay*, the court's holding that the police were not justified in detaining and frisking an African-American man who approached a house at which a narcotics search was underway rested at least in large part on the officer's statement that a reason for the frisk was the officer's fear of being a white police officer in a predominantly African-American neighborhood. The court condemned the "use of race in combination with other factors to justify investigative searches and seizures." *Id.* at 159. Subsequent Eighth Circuit decisions show that courts and litigants should not read *Clay* too restrictively. In *Patterson*, the court described *Clay* as a "fact-driven" opinion (885 F.2d at 484), and upheld a "security frisk" of "an individual approaching and entering a structure housing a drug operation" on the facts of that case (*id.* at 484-85). And, in *United States v. Maddox*, 388 F.3d 1356, 1364 (8th Cir. 2004), the Eighth Circuit stressed that *Clay* did not "hold that an officer may never detain a person who has approached the scene of an arrest. Rather, it held that the detainee's race cannot provide the basis of a reasonable and articulable suspicion of criminal activity." Here, as in *Maddox*, "racial profiling is simply not at issue," and "*Clay* is therefore inapposite." *Id.*

alternative contention that Officer Chavez had a reasonable, articulable basis to suspect that Defendant may have been involved in criminal activity as he approached the residence.[3]

### B. The seizure of items from Defendant's vehicle

Defendant also challenges the impoundment and inventory of his vehicle. As set forth above, Defendant was arrested and handcuffed following the discovery by Officer Chavez of marijuana in Defendant's pocket. A short time later, Officer Fernandez asked Defendant what he was doing at the residence. Defendant responded that he was there "to buy a rock," which the parties agree was slang for crack cocaine. The officers subsequently impounded Defendant's vehicle and conducted an inventory search, during which they found additional quantities of marijuana and a loaded gun.

#### 1. The impoundment of Defendant's vehicle

As an initial matter, the Government concedes that (i) Defendant has standing to challenge the search of the vehicle; (ii) the officers lacked probable cause to search the vehicle; and (iii) the search cannot be justified as incident to a valid arrest. However, the Government contends that once Defendant acknowledged that he had come to the Throop residence "to buy a rock," the officers had probable cause to believe that Defendant had used the vehicle in an attempt to purchase a controlled substance and that, armed with that information, the officers validly impounded Defendant's vehicle under the authority of Chicago Municipal Code Section

---

[3] In that regard, the Court notes that some cases suggest a rather categorical approach to persons in the immediate vicinity of drug trafficking. See, *e.g.*, *Bohannon*, 225 F.3d at 617 (explaining that "[t]he possible danger presented by an individual approaching and entering a structure housing a drug operation is obvious"); see also *Jennings*, 544 F.3d at 818 (explaining that in *Bohannon*, the Sixth Circuit held that a person's "arrival at a residence that housed a drug lab made it reasonable for the officers to suspect that he too was involved in criminal activity"). Other cases counsel in favor of a more cautious approach, stressing that individualized suspicion remains the touchstone, lest officers be permitted to assume that anyone who approaches a residence where drugs have been sold necessarily is involved in criminal activity. See, *e.g.*, *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person").

7-24-225(a). Defendant "challenges the impoundment of the car based on the lack of probable cause to believe that it was used in an attempt to purchase drugs."

Under controlling case law, the Court must "treat[] impoundments and inventory searches as distinctive processes, which are warranted in different (though frequently overlapping) circumstances." *United States v. Duguay*, 93 F.3d 346, 352 (7th Cir. 1996) (citing *South Dakota v. Opperman*, 428 U.S. 364, 368-69 (1976)). "An impoundment must be supported by probable cause or be consistent with the police role as 'caretaker' of the streets and completely unrelated to an ongoing criminal investigation." *Id.* As noted above, the Government proceeds here under the former theory.

On the undisputed facts concerning the chain of events that unfolded on February 16, 2008, the Court agrees that the officers had probable cause to impound Defendant's vehicle. Officer Chavez observed Defendant walk from the vehicle to the porch of the residence. Officer Fernandez saw Defendant knock on the door of the residence. Both officers were present on the porch as Defendant was detained and subjected to a "pat-down" frisk that led to his arrest. And both officers were present when Defendant admitted that he had come to that location "to buy a rock." Fernandez further learned from Defendant's gesture, confirmed by Chavez, that Defendant had arrived on the scene in the Nissan Rogue that was impounded and later searched. In fact, the key to that vehicle was in Defendant's pocket. These facts, taken together, amount to probable cause to believe that the vehicle was subject to impoundment under the Chicago Municipal Code.

Defendant does not challenge the validity of the Code provision on which the Government relies; rather, he suggests that probable cause was lacking and points to the lack of specificity in the officers' reports as evidence that they never had probable cause. While it is

true, as the Government acknowledged at the hearing, that the officers might have more clearly indicated on the forms the specific reason for the impoundment and search of Defendant's vehicle, the lack of specificity on the form does not obviate the detailed stipulated facts before the Court that include Defendant's unchallenged admission that he arrived at the premises in the Nissan Rogue with the intent to buy a controlled substance. In other words, even if the forms alone might not support a conclusion that the officers had probable cause to impound the vehicle, the Court cannot ignore the entirety of the record, which viewed as a whole shows a very strong case for a probable cause determination sufficient to justify the impoundment. See *Duguay*, 93 F.3d at 353 (automobile may be impounded if officers have probable cause that the driver has engaged in criminal activity).[4]

### 2. The inventory of Defendant's vehicle

The rationales for conducting an inventory of the contents of an impounded vehicle are separate from the rationales for the impoundment in the first place. *Duguay*, 93 F.3d at 352. Where, as here, the impoundment is valid, an inventory may be taken "'to protect an owner's property while it is in the custody of the police, to ensure against claims of lost, stolen, or vandalized property, and to guard the police from danger.'" *Id*. (quoting *Colorado v. Bertine*, 479 U.S. 367, 372 (1987)). Consistent with these principles, "[w]arrantless inventory searches of automobiles in police custody do not violate the Fourth Amendment" if they are "'sufficiently regulated to satisfy the Fourth Amendment.'" *United States v. Lomeli*, 76 F.3d 146, 148 (7th Cir.

---

[4] For example, in the "Notice of Vehicle Impoundment" report, the officer who prepared the report checked the box marked "[i]t was found to contain controlled substances * * * *or* it was used in the * * * attempt to purchase * * * controlled substances * * * in violation of Section 7-24-225 of the Municipal Code of Chicago." Defendant complains that, given that the wording is in the alternative, the officer should have stricken the former clause if the latter clause provided the justification for the impoundment. Again, while the information provided on the face of the "Notice" alone might not suffice to justify the impoundment, the undisputed record as a whole amply shows that the officers had probable cause to impound the vehicle.

13

1996) (quoting *Florida v. Wells*, 495 U.S. 1, 5 (1990)). Most significantly, "standardized criteria or established routine" must be followed in undertaking inventory searches (*Florida*, 495 U.S. at 4; *Duguay*, 93 F.3d at 351) to ensure that "a police procedure is not merely a pretext for concealing an investigatory police motive." *Lomeli*, 76 F.3d at 148. "But the fact that an inventory search may also have had an investigatory motive does not invalidate it." *Id*.

Here, it is unclear whether Defendant is even challenging the inventory apart from the impoundment. Defendant makes no argument that Chicago does not have standardized criteria for taking an inventory of a vehicle's contents or that the officers who conducted the inventory in this case did not follow their customary procedures. And all of the reasons for taking an inventory of an impounded vehicle set forth by the Supreme Court and the Seventh Circuit – which protect both the Defendant and the officers – applied in the circumstances of this case. At the time that they undertook the inventory, the officers could not have known that they would find drugs and a loaded weapon. But because those items were found in a lawful inventory undertaken following a valid impoundment, the motion to suppress must be denied.

**III. Conclusion**

For the reasons stated above, Defendant's motions to suppress [24, 27] respectfully are denied.

Dated: May 26, 2009

_____
Robert M. Dow, Jr.
United States District Judge

14